OPINION OF THE COURT
Richard D. Huttner, J.
Does the First Amendment protection guaranteeing the free exercise of religion estop the State from compelling the respondent to support his dependent wife and children?
This is a support proceeding commenced by the Department of Social Services, City of New York, as assignee of respondent’s wife, pursuant to section 571 of the Family Court Act. In the instant proceeding, the Department of Social Services seeks an order of support against respondent as reimbursement for welfare aid currently being paid to his wife and children. It should be made clear that *664 the Department of Social Services does not contest the wife and children’s entitlement to benefits, but merely seeks reimbursement in this proceeding from the respondent arising from his legal duty to support his dependents.
Since 1976, respondent has been a member of a religious group known as the International Society of Krishna Consciousness (Iskcon), commonly referred to by the misnomer, “Hare Krishna”. The parties were married in 1975, and the children were born in 1976 and 1979. Prior to his total devotional commitment to Iskcon, respondent supported his family from earnings derived from self-employment in the graphics field. Thereafter, respondent conveyed all his business assets to Iskcon, and commenced full-time residence in the sect’s temple, spending his entire time practicing this religion. Respondent submitted a letter from the president of Iskcon confirming that when not actually engaged working gratis at the temple on behalf of the sect, his time is committed to “daily study, chanting, and meditation”. The letter further states, “Mr. I. is supported by the society. In return for his full-time devotional service to the Lord, he receives room, board, and basic hygienic supplies. However, he receives no income and holds no money”. The letter further describes the respondent as “a strict follower of this Vedic tradition”. These benefits are also available to respondent’s family should they become celebrants of Iskcon and reside with the respondent at the temple.
I make the following findings of fact. First, I am satisfied that the respondent’s refusal to work in gainful employment emanates from a sincerely held theological belief that he must devote himself fully to the religious practices of Iskcon. Secondly, I find that Iskcon is a religious corporation and is recognized as such by the State of New York, and has received tax exempt status both from the Internal Revenue Service and the New York State Department of Taxation and Finance. Thirdly, I find to be a fact that the respondent’s wife and children would be fully subsidized by Iskcon should his family choose to reside in the society’s temple, and devote themselves fully to Iskcon’s religious practices and dogmas. Absent this *665 arrangement, the sect refuses to undertake his family’s support. The wife declined this offer because she does not choose to participate in the restrictions and rituals requisite to life in the temple. It is respondent’s contention that his wife’s refusal to reside with him in the temple is tantamount to abandonment, and such misconduct on her part relieves him of any obligation to support her.
Before addressing the constitutional issue presented herein, this contention by the respondent should be discussed. It is significant that the practice of the respondent’s particular religion requiring a full-time, all encompassing commitment, is substantially more rigorous than traditional Judeo-Christian religious practices. In a letter furnished to the court by Iskcon, it was stated that sectarians of respondent’s faith who reside in the temple, as does respondent, must wear uniform garb (in the nature of a robe), practice vegetarianism and perform daily religious ritualistic practices. In sum, the respondent’s wife would be compelled to live a monastic, spartan existence, devoted totally to the worship of “Krishna Consciousness”.
The wife, in order to conform to her marriage vows, need not subject herself to what is tantamount to ideological bondage as a prerequisite to both her right and her children’s rights to support. The notion that a wife must surrender both her theological principles and her chosen lifestyle as a condition of receiving support from her spouse, is both repugnant and alien to western man’s concept of personal liberty. Each spouse has two separate and distinct rights: the statutory right to be supported by his or her spouse, if unable to be self supporting, and the fundamental constitutional right to freely practice his or her chosen religion without unwarranted State interference. (Family Ct Act, § 412; US Const, 1st Arndt.) If the court were to concur with respondent’s view that his wife’s refusal to live in the temple constitutes misconduct, then the court would be offering his spouse a Hobson’s choice of either embracing her husband’s religion, or suffer the loss of his support and the attendant indignities that are the wretched ingredients of economic deprivation. Such a choice would constitute a coercion, the effect *666 of which would be an indirect and impermissible intrusive assault by the State upon the wife’s First Amendment right to the free exercise of her religion. Assuming, arguendo, that such a refusal by the wife to join her husband’s religion is, by some sophism, considered marital misconduct, respondent nevertheless would still be required to support his wife and children by virtue of the newly enacted section 236 of the Domestic Relations Law. Interestingly, the amended statute has eliminated the defense of misconduct as a ground to relieve a spouse of the duty to support. (Domestic Relations Law, § 236, as amd by L 1980, ch 281 and ch 645.)
Indeed, even prior to the amended section 236 of the Domestic Relations Law respondent, under the precedent of prior holdings, would be required to support his wife and children, since they are now public charges. (Family Ct Act, § 415; Matter of Mercer v Mercer, 26 AD2d 450; Matter of Leif v Leif, 55 AD2d 679.) With respect to the respondent’s obligation to support his minor children, certainly there is no question of the absolute obligation of a parent to support his or her dependent minor children: (Family Ct Act, § 413.)
Having diposed of the foregoing defenses, there remains for the court’s consideration the constitutional issue raised by respondent. Respondent postulátes that an order of this court imposed upon him to support his wife and children results in an unwarranted State interference with the practice of his religion (which prohibits gainful employment) and is thereby violative of his First Amendment right.
The First Amendment embodies two distinct clauses with regard to freedom of religion, and provides: “Congress shall make no law respecting an establishment of 'religion, or prohibiting the free exercise thereof’ (US Const, 1st Arndt). This First Amendment guarantee has been made applicable to the States through selective incorporation into the due process clause of the Fourteenth Amendment. (Gitlow v New York, 268 US 652; Fiske v Kansas, 274 US 380.)
Although First Amendment guarantees are considered indispensible to our democratic society, and are thus jeal *667 ouály guarded by our courts, they are not inviolate. In Reynolds v United States (98 US 145), the Supreme Court of the United States over 100 years ago, enunciated a constitutional principal that remains viable today. Where religious practices themselves conflict with the public interest, they are not protected by the First Amendment and, “it has long been recognized that the First Amendment does not necessarily shield freedom of actions undertaken in the exercise of religion, as opposed to freedom of belief or thought.” (Matter o fEichner [Fox], 73 AD2d 431, 457, n 16.) If a legitimate State interest conflicts with a religious practice, then such practice must survive a constitutional balancing test wherein the practice is weighed against the legitimate State interest. If such interest is determined to have primacy, then the State may intercede and such religious practice must be subordinated to the compelling State interest. Insubstantial conflicts between the religious practice and the claimed State interest will not suffice to subordinate the fundamental First Amendment right. The Supreme Court of the United States has declared that, “[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation” (Thomas v Collins, 323 US 516, 530; Buckley v Valeo, 424 US 1, 64-65; Sherbert v Verner, 374 US 398, 406). A State’s interest is compelling when the end that it achieves is so vital to society that its essentiality overrides the loss of the protected religious right. (Elrod v Burns, 427 US 347; Wisconsin v Yoder, 406 US 205; Sherbert v Verner, supra; Braunfeld v Brown, 366 US 599; Cantwell v Connecticut, 310 US 296; Reynolds v United States, 98 US 145, supra.) The issue to be determined is whether the State interest that exists in this case is so compelling that it warrants State interference with the respondent’s free exercise of his religion.
The duty of parents to provide shelter and sustenance to their dependents according to their capability is an obligation which is perhaps the most fundamental and necessitous known to society, both animal and human. It is axiomatic that civilization would be driven to extinction, but for the productivity contributed by those members able to provide for the sustenance of themselves and those *668 dependent upon them. That the capable support the incapable was a law of nature long before it was a law of man, and until our return to the paradise that was the Garden of Eden, this will continue to be man’s burden to bear. A fortiori, the power must abide in the State to compel its able members to support their dependents. This elementary bic-sociological concept finds expression in article 4 of the Family Court Act. (Family Ct Act, §§ 412-415.) The State recognition of respondent’s obligation to support his family as a compelling State interest is made abundantly clear by the comments of the Governor made with regard to the enactment of section 571 of the Family Court Act. He stated: “In essence, the enactment of this legislation reaffirms the public policy of the State that a parent who is able to support his dependents cannot merely abandon his family and shift his obligations to the. taxpayers of this State.” (Governor’s Memoranda on Approval of Bills, 1975 McKinney’s Session Laws of NY, p 1767; emphasis added.) To accede to the defense raised by respondent that he need not conform to statutory mandates imbued with the public interest regarding support of his family because it impedes his religious activity, would make personal religious practice superior to law.
The courts have considered many cases wherein the public interest conflicted with specific religious practices. In the following cases the courts subordinated the religious practice to what was determined to be a compelling State interest. In Reynolds v United States (98 US 145, supra), the court prohibited the religious practice of polygamy on the grounds that the maintenance of monogamy was a compelling State interest. Snake handling, as a religious practice was prohibited based upon the compelling State interest of insuring safety to its citizens. (Lawson v Commonwealth, 291 Ky 437.) The maintenance of prison decorum was found to be a compelling State interest and accordingly certain religious practices of detainees were forbidden. (Wilson v Beame, 380 F Supp 1232.) A refusal based upon religious grounds, to testify at a Grand Jury proceeding, was subordinated to the compelling State interest of insuring the smooth functioning of the Grand Jury so vital to the criminal justice *669 system. (Smilow v United States, 465 F2d 802; United States v Huss, 482 F2d 38.) The maintenance of an army was found to be a compelling State interest and consequently the defendant was required to register with the military despite a religious objection. (United States v Reiss, 478 F2d 338.) The continued existence of the Social Security system was found to be a compelling State interest, resulting in requiring plaintiff to make tax contributions despite a religious objection. (Varga v United States, 467 F Supp 1113, affd without opn 618 F2d 106.) In Sherwood v Brown (619 F2d 47), the court found that the safety of the plaintiff and fellow sailors was a sufficient compelling State interest to require him to wear a helmet instead of a turban as dictated by his religion. The State’s interest inherent herein in mandating support, is no less vital or compelling than the interests expressed in the foregoing cases. In fact, it is difficult to conceive of a more compelling State interest than insuring that those who have the responsibility of support be required to discharge it.
However, so venerated and revered is the First Amendment protection, that simply finding a compelling State interest alone will not suffice to justify its abrogation. The State must seek, if possible, to achieve the compelling secular interest through alternative means which do not infringe upon the free exercise clause. (Elrod v Burns, 427 US 347, 363, supra; Gillette v United States, 401 US 437; United States v Robel, 389 US 258; Sherbert v Verner, 374 US 398, supra.) It is only in the absence of such an alternative that the State will be permitted to intrude upon the individual’s right to practice his religious belief.
Does the availability of public assistance for the wife and children constitute such an alternative? If so, then the State may not interfere with the respondent’s free exercise of his religion. (Gillette v United States, supra; United States v Robel, supra.)
Welfare is an institution conceived by a civilized society to assure that its members who are not capable of self-support do not perish. It does not exist to eliminate or alleviate the burden to provide support placed upon those equipped to shoulder that burden. Its very being is depen *670 dent upon the tax dollars contributed to it by the State’s productive citizenry. It is syllogistic that if those who are depended upon to contribute, instead withdraw or cause a depletion of its coffers, the system will cease to be. This must be avoided since it is very much in the public interest that the welfare system endure and continue to confer its most substantial benefit upon society. In Varga v United States (467 F Supp 1113, supra), the plaintiff refused to contribute taxes to the Social Security system based upon religious objections. In commenting upon the necessity for maintaining the Social Security system (which has a somewhat similar economic purpose as the welfare system) that court opined (p 1118): “[The] governmental interest in assuring a source of funds for the Social Security system is sufficiently compelling to justify the incidental burden placed upon plaintiff’s right to the free exercise of his religion.” This court finds not only is there a compelling State interest that respondent supports his dependent children and wife, but additionally there is another compelling State interest that the insth tution of welfare endure. Therefore, the payment of public assistance to respondent’s dependents cannot be considered a viable alternative to his gainful employment.
The concept of separation of church and State is yet another reason for denying respondent’s constitutional defense. The First Amendment provides, inter alia: “Congress shall make no law respecting an establishment of religion” (US Const, 1st Arndt). Since the Constitution was framed, our courts have been vigilant to preserve this separation. “In the words of Jefferson, the clause against establishment of religion by law was intended to erect ‘a wall of separation between church and State’ ” (Everson v Board of Educ., 330 US 1, 16). Should the respondent be disencumbered from his duty to support simply because his religious practice renders it impossible for him to be gainfully employed, the State then, by furnishing public assistánce to his wife and children, would indirectly be financing respondent’s religious practice. Such governmental meddling, beneficent as it may appear, constitutes a blatant violation of the spirit of the establishment cláuse. Since even subtle departures from governmental *671 neutrality in this area are forbidden, respondent’s reliance on public assistance payments to his family as an alternative to his personal obligation cannot be countenanced. (Gillette v United States, 401 US 437, supra.)
Accordingly, the hearing examiner’s report is confirmed and respondent is ordered to pay the sum of $25 weekly for the support of his wife and children, effective February 15, 1981, through court to the Department of Social Services.